## GLENAYRE ELECTRONICS, LTD., Plaintiff,

v.

## Joel SANDAHL, individually, and Complex Systems, Inc., an Illinois Corporation, Defendants.

### No. 92–3070.

United States District Court, C.D. Illinois, Springfield Division.

Feb. 8, 1993.

Delmer R. Mitchell, Gena J Awerkamp, Schmiedeskamp Robertson Neu & Mitchell, Quincy, IL, F. Ross Boundy, Christensen O'Connor Johnson & Kindness, Seattle, WA, for plaintiff.

Tyrone Fahner, Jonathan J. Olcott, Kenneth J. Jurek, David L. Witcoff, Keith C. Hannigan, Mayer Brown & Platt, Chicago, IL, John M. Myers, John H. Long, Long Morris Myers & Rabin, PC, Springfield, IL, Michael Stolarski, Roger H. Dusberger, Motorola, Schaumburg, IL, for defendants.

## OPINION

RICHARD MILLS, District Judge:

On August 25, 1992, this Court disqualified the law firm of Mayer Brown & Platt from representing the Defendants. Immediately thereafter, Defendants filed a petition for a writ of mandamus to the Seventh Circuit requesting that Mayer Brown be reinstated as counsel. Defendants asked for a 30 day stay of the proceedings while their petition was pending.

It has recently come to the Court's attention that although the 30 days have expired, and the Seventh Circuit granted Defendants' petition on December 2, 1992,[1] the stay has not been formally lifted on the Court's docketing system. We now address that stay on our own motion.

In addition, the Court observes that the Seventh Circuit's opinion omitted some facts from the writ of mandamus on which

---

1. This Court received the mandate from the Seventh Circuit on January 4, 1993.

this Court relied when it disqualified Mayer Brown. Although this Court did not spell out all of these facts in its order of disqualification of Mayer Brown, all of the factual details were clearly set out both in the record and in prior orders. The Court believes any misconception should be corrected and the facts should be accurately set forth in the published opinions concerning this case.

## I. FACTS

In July of 1989, Glenayre Electronics, Ltd. (Glenayre) purchased Quintron Corporation (Quintron) located in Quincy, Illinois, which became known as Glenayre Quincy.[2] Its primary function was the development and manufacture of paging systems.[3] In fact, two years earlier, Quintron began negotiations with SimulComm Partnership (SimulComm) for the acquisition or license of technology related to paging systems known as SCS technology.[4] During the negotiations in August of 1988, Joel Sandahl, the managing director of SimulComm, left it and joined Quintron.[5] After Mr. Sandahl arrived at Quintron, a final licensing agreement was executed whereby Quintron would be the exclusive licensee of the SimulComm system.[6] In January of 1990, Mr. Sandahl left Quintron, along with two other engineers, and formed Complex Systems (Complex).[7] For approximately the next six months, Mr. Sandahl, operating through Complex, continued to provide consulting services to Glenayre.[8]

Meanwhile, Glenayre claims that it was independently developing a new paging system entitled "Omega Gold" at considerable effort and expense.[9] The Omega Gold system includes valuable trade secrets which are Glenayre's exclusive property.[10] Consequently, it has determined that severable patentable inventions are present in the Omega Gold system and is currently in the process of obtaining patent protection for them.[11]

As part of this process, several technical documents, including patent applications, have been prepared by Glenayre's personnel and patent counsel.[12] Glenayre maintains that it has not published or otherwise disseminated these documents or materials; nevertheless, it believes that Defendants obtained Glenayre's proprietary and trade secret information which they could use to acquire a competitive advantage.[13]

In fact, Complex is developing a new paging system referred to as C–NET.[14] At the time these proceedings were initiated, Complex's design of the C–NET system was the subject of an arbitration proceeding in Quincy, Illinois, between Glenayre and Complex regarding Complex's alleged violation of its noncompete agreement with Glenayre.[15]

During a pre-trial hearing in relation to the arbitration proceedings, Mr. Sandahl stated that an attorney had examined both the Glenayre and C–NET patent applications and found that Glenayre's application

2. Memorandum in Support of Plaintiff's Motion for Preliminary Injunction and Expedited Discovery, at 1.

3. Memorandum in Support of Plaintiff's Motion for Preliminary Injunction and Expedited Discovery, at 1.

4. Memorandum in Support of Plaintiff's Motion for Preliminary Injunction and Expedited Discovery, at 1–2.

5. Memorandum in Support of Plaintiff's Motion for Preliminary Injunction and Expedited Discovery, at 2.

6. Defendant's Verified Answer, Affirmative Defenses and Counterclaim, Exhibit A.

7. Memorandum in Support of Plaintiff's Motion for Preliminary Injunction and Expedited Discovery, at 2.

8. Memorandum in Support of Plaintiff's Motion for Preliminary Injunction and Expedited Discovery, at 2.

9. Complaint, at ¶ 8.

10. Complaint, at ¶ 8.

11. Complaint, at ¶ 8.

12. Complaint, at ¶ 9.

13. Complaint, at ¶¶ 10–11.

14. Court's Order, June 3, 1992, at ¶ 2.

15. Court's Order, June 3, 1992, at ¶ 2.

was a "clone" of Complex's.[16] It is this event that lead Glenayre to the conclusion that Complex somehow obtained a copy of its confidential and proprietary information relating to Omega Gold.[17]

On April 3, 1992, Glenayre filed a complaint for, *inter alia,* a preliminary injunction to enjoin Defendants from utilizing any information obtained from Glenayre. This Court granted the motion for a preliminary injunction, however it allowed both parties to continue to pursue patent applications on the technology at issue.[18]

For some time, and while these proceedings were before the Court, Glenayre was in negotiations with N–W Group, Inc. (N–W Group) for the acquisition of certain assets of Glenayre.[19] These negotiations culminated in a Purchase and Sale Agreement executed on July 16, 1992, whereby N–W Group agreed to acquire all of Glenayre's right, title and interest to the present case.[20]

Meanwhile Mayer Brown had been serving as general counsel to N–W Group for all of its business transactions until the first half of 1991.[21] Subsequently, Mayer Brown learned that another law firm was serving as N–W Group's general counsel, and since then Mayer has been asked to only perform work related to N–W Group's two employee incentive plans.[22]

In July 1992, Defendants sought to retain Mayer Brown in this case.[23] On July 7, 1992, *prior to filing its Notice of Appearance,* Mayer Brown corresponded with Plaintiff's counsel indicating its intent to appear.[24] One day later, Plaintiff's counsel learned of Mayer Brown's representation of N–W Group and on July 10, 1992, Plaintiff's counsel informed Mayer Brown that a conflict of interest would arise between its representation of N–W Group and Defendants.[25]

Mayer Brown spoke with N–W Group's outside counsel who indicated that Mayer Brown did not need to obtain its consent to represent Defendants because Mayer Brown could withdraw from representing it prior to acquisition.[26] Mayer Brown sought N–W Group's consent to its representation of Defendants; however, that consent was refused.[27] Consequently, in light of a possible conflict of interest that could arise if the acquisition came to fruition, on July 31, 1992, Mayer Brown notified N–W Group that it was withdrawing its representation, but that it would nonetheless like to complete the employee stock plans which it was preparing on behalf of N–W Group.[28]

As a result of the simultaneous representation of N–W Group and Defendants, Glenayre moved to have Mayer Brown disqualified under Rule 1.7. The Court ordered the parties to identify what confidential information Mayer Brown received from its representation of N–W Group and that information's relationship to this case. Plaintiff stated that Mayer Brown was provided with a draft of the Purchase and Sale Agreement and the Draft Proxy Statement which included "sensitive information regarding the financing of the acquisition, certain stock option rights of current Gle-

**16.** Court's Order, June 3, 1992, at ¶ 2.

**17.** Court's Order, June 3, 1992, at ¶ 2.

**18.** See Court's Order, June 3, 1992.

**19.** Plaintiff's Memorandum in Support of Plaintiff's Motion to Disqualify Mayer Brown, at 2.

**20.** Plaintiff's Memorandum in Support of Plaintiff's Motion to Disqualify Mayer Brown, at 2.

**21.** Defendants' Memorandum in Opposition to Disqualify Mayer Brown, at 2.

**22.** Defendants' Memorandum in Opposition to Disqualify Mayer Brown, at 2.

**23.** Defendants' Memorandum in Opposition to Disqualify Mayer Brown, at 2.

**24.** Plaintiff's Memorandum in Support of Plaintiff's Motion to Disqualify Mayer Brown, at 3.

**25.** Plaintiff's Memorandum in Support of Plaintiff's Motion to Disqualify Mayer Brown, at 3.

**26.** Defendants' Memorandum in Opposition to Disqualify Mayer Brown, at 2.

**27.** Defendants' Memorandum in Opposition to Disqualify Mayer Brown, at 2.

**28.** Letter from Francesca Maher, attached to Defendants' Memorandum in Opposition to Disqualify Mayer Brown.

nayre senior management, the fact that certain employees of Glenayre will enter into employment agreements, and Glenayre's evaluation of the paging market."[29] Mayer Brown verified that it received the documents which Plaintiff reported; however, it stated that the information contained in those documents would either potentially be publicly disclosed pursuant to SEC rules or not confidential under the Illinois Rules of Professional Conduct.[30]

The Court determined that Mayer Brown's representation of Defendants and N–W Group presented a conflict of interest and applied Rule 1.7 (present client standard) since N–W Group was a client at the time Mayer Brown agreed to represent Defendants. *See Florida Ins. Guaranty Assn. v. Carey Canada, Inc.*, 749 F.Supp. 255 (S.D.Fla.1990). Accordingly, the Court disqualified Mayer Brown.

On November 10, 1992, N–W Group acquired Glenayre by merger and changed its name to Glenayre Electronics, Inc. As per the Purchase and Sale Agreement, this lawsuit and all of the rights and liabilities attendant thereto, became vested in Glenayre Electronics, Inc.

## II. CONCLUSIONS

On December 2, 1992, the Seventh Circuit granted Defendants petition for a writ of mandamus and reversed this Court's order disqualifying Mayer Brown. 980 F.2d 1118. In its opinion, the Seventh Circuit failed to mention that the acquisition of Glenayre by N–W Group did in fact take place. The opinion also noted that this Court did not rely on the fact that Mayer Brown may have obtained information from N–W Group which it could have used to Defendants' advantage. This Court is somewhat puzzled by this assertion since the endangerment of client confidences is inherent in the rules governing conflicts of interest. *See Florida Ins. Guaranty Assn.*, 749 F.Supp. at 261. However, be that as it may, according to the opinion such a basis would not have warranted

disqualifying Mayer Brown unless Plaintiff could substantiate its fear that Mayer Brown may have learned something from its representation of N–W Group which it could use to Defendants' advantage in the case at bar.

Since the Court received the Seventh Circuit's mandate regarding the appeal of the disqualification order, there is no reason why these proceedings should continue to be stayed. Also, in light of the acquisition of Glenayre Electronics Ltd. by N–W Group, this Court will allow Plaintiff's motion for substitution of Glenayre Electronics, Inc. as the Plaintiff in this cause.

*Ergo*, the clerk is directed to lift the stay placed on these proceedings. Per the Seventh Circuit's writ of mandamus, this Court hereby vacates its order disqualifying the law firm of Mayer, Brown & Platt. Finally, Plaintiff's motion for substitution of transferee is ALLOWED.

---

**29.** Plaintiff's Supplemental Brief Re: Motion to Disqualify, at 3–4.

**30.** Defendants' Response to Questions Contained in the Court's Order of August 17, 1992.